FILED

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

04 JUN 24 AM 10: 24

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **JOHN TURNIPSEED, a minor by and through his parent and next friend, LIBBY TURNIPSEED,** | ) ) ) ) |
| **Plaintiff,** | ) ) ) |
| **v.** | ) **CASE NO. CV-03-PT-1574-M** ) |
| **ATTWOOD CORPORATION,** | ) ) |
| **Defendant.** | ) |

DR

# ENTERED

JUN 2 4 2004

## MEMORANDUM OPINION

This cause comes on to be heard upon defendant Attwood Corporation's ("Attwood") Motion for Summary Judgment, filed on April 1, 2004, and defendant's Motion to Exclude Testimony of Elmer Wayne McCain, also filed on April 1, 2004.

## FACTS AND PROCEDURAL HISTORY

On August 31, 2002, while inner tubing on the Coosa River, plaintiff John Turnipseed's ("Turnipseed") leg was severely injured. Plaintiff was riding one of two inflatable tubes being pulled behind a boat. Plaintiff's friend was riding the other tube. Immediately prior to Turnipseed's accident, his friend either fell or rolled off the other tube. The now-unoccupied tube (called "the Stearns tube" by defendants) skipped across the water and landed on Turnipseed. The tow rope, which had been attached to the Stearns tube with a metal clip referred to as a "universal snap hook,"[1]

---

[1] Throughout this memorandum opinion, this court also refers to the product as "the hook."

1



somehow pulled into the back of Turnipseed's leg.[2]

The universal snap hook manufactured by Attwood is a pear-shaped piece of stainless steel 3/8 inches in diameter. The "gap" of the hook is kept closed by means of a spring-loaded "gate," the tip of which fits into a relief on the tip of the hook. When the gate is closed, the hook appears to be a continuous metal loop. The Attwood packaging lists the uses of the hook as: "Secures and joins halyards or sails. Use on motor safety lines or tow ropes."

According to Don Olsen ("Olsen"),[3] each year Attwood distributes 35,000 to 37,000 universal snap hooks nationwide. Neil Manufacturing Products ("Neil") produces the product in Taiwan for distribution by Attwood. Attwood may request design changes from Neil. Responsibility for design issues falls under engineering, marketing, and sales. Olsen anticipates using Attwood's universal snap hooks for tie-down applications, securing lines, and other applications involving ropes and securing. While Olsen would anticipate use of the product in sports and recreation to secure lines, he would not necessarily anticipate its use for towing objects with people on them. According to Olsen, it is not reasonable to presume that when a product is distributed to an outlet such as a store that sells sporting equipment/goods that people will use the product to tow themselves on inner tubes, knee boards, and equipment of that nature.

No warnings appear on the universal snap hook itself or its packaging. A warning does appear in Attwood's product catalog stating that the hook is not recommended where life and limb are at risk. This catalog is generally issued to manufacturers and retailers rather than to consumers. According to Olsen's testimony, placing a warning on the universal snap hook's packaging would

---

[2] According to plaintiff, the hook "snagged" his leg.

[3] Olsen is Attwood's Product Development Director.

involve minimal expense.

Olsen is aware that the universal snap hook will come into contact with human hands and people in general. Olsen can also assume that tow ropes will not always be taut when in use for carrying or towing. Olsen admits that the statement on the product packaging "use on motor safety lines or tow ropes" does not indicate that a person should not tow humans on objects like inner tubes, small boats, and knee boards.

According to Olsen, there have been no discussions at Attwood about the design or re-design of the locking teeth. He does not know if the product will work just as well with squared off, unsharp, or blunted teeth. That issue would have to be reviewed. No one has looked into alternative designs or other manufacturers/suppliers. Olsen does not know what Attwood's competitors are doing regarding snap hook design.

Olsen believes the pointed-toothed design is used by Attwood because of fraying rope, i.e., to make sure it locks in tight. Olsen does not know if there has been any consideration of the sheath or cover over the hinge pin or movable part that contains the locking teeth. Olsen testified that it would probably be relatively inexpensive to include such a sheath/cover, maybe adding $.50 to the cost of the product. The retail price of the 4-inch universal snap hook is around $10.00.

Olsen agrees that any quality assessment of a product involves in part determining whether the product is reasonably safe, and one of Attwood's responsibilities would be to identify potential hazards. In Olsen's opinion, Attwood has a responsibility to design a product that eliminates reasonably foreseeable hazards. Olsen agrees that if Attwood could not design the product to eliminate what is seen as a potential hazard, there should at least be a warning to the consumer.

Attwood tested the strength of its universal snap hooks by means of random tensile load

3

testing. Attwood has never discussed putting any type cover or protection over the locking teeth as a result of the testing, even though in tensile load testing, when the hook started to fail, the teeth came apart and broke. Olsen has never looked into whether Neil Manufacturing has any alternative shapes or designs that Attwood could perhaps order.

According to Olsen, Attwood's engineer determined the design of the snap hook. If the engineer at Attwood told Neil "don't make the tip of those locking teeth so sharp or blunt off the edge of the locking teeth," that would be within Attwood's power, with approval of Attwood's marketing and sales division. However, such a step has never been considered.

Olsen believes that using the clip to tow an inner tube with a person on it is an inappropriate use of the universal snap hook because it would increase the risk of injury due to the proximity of the product with the person. Based on his understanding of how the injury occurred, Olsen testified, sharp edges resulted in increased risk. No warnings to that effect appear on the product or its packaging.

Steven Hogle ("Hogle"), Attwood Product Design Engineer, has a bachelor of science in mechanical engineering from Michigan Tech. He began his career at Attwood in 1997, although he has only held his current position for two years. Hogle does not recall requesting Neil to make design changes to the universal snap hook. There have been no changes in the hook since he began working at Attwood, although design change requests have been done with other Attwood products. The stated purpose of the design of the gate (toggle) on the universal snap hook is to lock the two components together.

Hogle testified that there is no specific purpose for the design with the point locking into the upper body and no specific reason for the edge to be pointed rather than blocked off. Hogle testified

4

that it is possible to blunt or block cut the edge.  Hogle is unaware of any alternative design or evaluation of the snap hook.  According to Hogle, sheathing or guarding the snap hook with a cover has never been contemplated by Attwood.

Hogle knows of no particular reason why a blocked/blunted instead of pointed edge would not work.  Hogle is unaware of any sharpness testing of the product, any standards or regulations that may apply to the product, or anything Attwood has ever done to discover whether there were any applicable standards/regulations.

Attwood does not have a design safety committee.  The product development team performs product safety review; however, those reviews are specific to new products and new product design. Attwood has no ongoing evaluation of existing products.  Hogle is unaware if Neil has any other available designs of the gate or locking teeth for the universal snap hook.

Hogle has had no courses or training on product warning issues and is unfamiliar with factors that go into the consideration of whether a warning is effective or not.  He can't think of any decision by Attwood about whether or not there should be a warning on the universal snap hook packaging. Hogle considers warnings an important part of product safety.  He said Attwood made no recommendations concerning use of the product for human towing.

When asked if the phrase on the snap hook packaging – "Secures and joins halyards or sails. Use on motor safety lines or tow ropes" -- indicates whether or not people should tow humans, Hogle admits that the use instructions do not "call out people (*sic*)."[4]

Hogle agrees that the way a warning is conveyed or placed can be almost as important as the decision to place the warning.  As for pages 121-122 of the Attwood catalog, Hogle testified, he does

---

[4] The court notes that deponent may have meant to say "call out to people."

5

not know how the warning "not recommended where life or limb is at risk" came to appear in the catalog or how long it had been included there.  The warning had been in the catalog since 1997, when Hogle attained his first position at Attwood.  Hogle could not explain the genesis of the catalog's wording.  The wording, Hogle stated, indicates that someone at Attwood may have seen towing or lifting humans as foreseeable.

For both Attwood gas tanks and seating products, Hogle stated, warnings appear on the products themselves as opposed to just on the packaging or in the Attwood catalog.  Hogle knows of nothing on the snap hook itself that would advise a potential buyer or user that "life or limb may be at risk," as stated in the catalog.  Hogle knows of no change in the product or its packaging since 1997.  Hogle is unaware of anyone else ever being cut or punctured by the gate or toggle of the universal snap hook.

When asked about the Sea Sense packaging, which states "not to be used to pull or lift humans," Hogle was unaware of any consideration of such a warning for the Attwood universal snap hook packaging.  According to Hogle, Attwood does not look at competitors' packaging to see how warnings are placed, although he admits that the Attwood engineering department tries to anticipate the uses of Attwood products.  Hogle is unaware of any other use of the hook to tow or lift humans except for this usage and does not foresee the hook's use in that context.

The Stearns tube on to which the allegedly defective universal snap hook was attached bore the following warnings:

> **WARNING**
>
> USERS OF THIS PRODUCT AGREE BY THEIR USE TO THE INHERENT RISKS INVOLVED IN THIS WATER SPORT ACTIVITY AND AGREE TO FOLLOW ALL INSTRUCTIONS CAREFULLY BEFORE USE TO LESSEN

YOUR RISK OF INJURY OR DEATH, FOLLOW THESE RULES.

- Read instructions carefully before using your Stearns tube.
- Not for use by children under six (6) years of age.
- This product should never be used by children over 6 years of age except under adult supervision.
- This is not a personal flotation device.
- Always wear a U.S. Coast Guard approved Type III(PFD) ski vest.
- Never place wrists through handles or towing harness.
- <u>Never use a metal clip to connect your tube to the tow line.</u>
- Boat operator and observers must use caution and common sense.
- Never tow or ride under the influence of alcohol or drugs.
- Boat driver should avoid excessive speed or sharp turns which might cause the tube to flip over abruptly resulting in serious injury to the rider.
- Never exceed 20 MPH when towing adults or 15 MPH with children.
- Do not ride near docks, pilings, bridges, shores or other boats.
- Tow rope must be at least 50 feet but not to exceed 65 foot length.
- Always have a person other than the driver in the boat as an observer.
- Do not ride if you feel tired, dizzy or faint.
- If the rider should fall of (*sic*), he/she should immediately let go of the tube handles.

(Emphasis added).

Turnipseed testified that he and two of his friends "chipped in" and bought the Stearns tube during the summer of 2002. After purchasing the Stearns tube, they kept it at plaintiff's boathouse. Turnipseed and his friends, with the assistance of Turnipseed's father, decided to use the Attwood hook to attach the tow rope to the Stearns tube. Further, Turnipseed testified, although his mother had not been involved in connecting the rope to the Stearns tube, he thought that she was aware that they had used the hook. Turnipseed testified regarding the warnings on the Stearns tube:

> Q: Is it important to read instructions?
> A: Yes, sir.
> Q: Can it be careless not to read the instructions?
> A: Yes, sir.
> Q: Did your father read the instructions?
> A: To what?
> Q: For the assembly of this system.

7

A: I'm not sure.
Q: Did you read the instructions?
A: For the assembly of what?
Q: For the assembly of the system, meaning the tube, what you call the tow hook, and the tube rope that we have in front of us.
A: I read the instructions of how to work the tube, but I don't think there is an assembly guide to how to hookup a rope.
Q: You said – did you read these instructions?
A: No, sir.
Q: And I'm point to or showing what is the Defiance [Stearns] tube, which I'll call the silver lining and the instructions here, and if I understood you correctly, you said you didn't read these, correct?
A: Right.
Q: You didn't read these before your accident?
A: Not that I recall, I'm not sure.
Q: And you don't know if your father read those before?
A: I'm not sure.
Q: Did he ever tell you he had read them?
A: I don't recall.
Q: Had your mama read the instructions?
A: I don't know.
Q: Did she ever tell you she had read them?
A: I don't know.
Q: I bet mama would tell you it's important to read instructions, though, wouldn't she?
A: Yes, she would.
Q: I bet daddy would tell you it's important to read instructions, wouldn't he?
A: Yes, he would.

Before his accident, Turnipseed testified, he had noticed that the gate on the universal snap

hook which injured him was not engaged and that it was in the same condition after his accident.[5]

---

[5] Defendant provides the following excerpt from plaintiff's testimony:

Q: Looking at the tow hook that is attached to the blank attachment, which would be next to the tube, okay?
A: Okay.
Q: This part [the "gate"] is not in, like this one, correct?
A: Correct.
Q: And you know how it works, don't you?
A: Yes, sir.
Q: You push in and then it comes back, correct?

A: Right.

Q: And this one in my left hand, which is a tow hook closest to the boat is now flush, correct?

A: Correct.

Q: This tow hook is not flush, correct?

A: Correct.

**Q: Was this tow hook, which was next to the tube that you were not on, not flush before your accident?**

**A: No, it wasn't.**

**Q: You had – was it in – if you were to look at it before your accident, does it look like it does to us today?**

**A: Yes, sir.**

Q: In other words, you would be looking at this tow hook and you would see that this piece is not flush or fully engaged?

A: Right.

Q: And you knew before your accident that it needed to be engaged?

A: I knew that it was safe enough that the rope wasn't going to come out.

Q: But you knew that it was designed where it would be engaged, didn't you?

A: It should be engaged.

**Q: And then before your accident, you knew that it was not engaged, correct?**

**A: Right.**

Q: Do you know how long it had existed in its not engaged state?

A: No, sir.

Q: Well, could it have been awhile?

A: I'm not sure.

**Q: But there's no doubt in your mind that you had noticed that the tow hook that y'all are claiming caused your injury was not engaged before your accident, correct?**

**A: That day?**

**Q: That day.**

**A: Correct.**

**Q: And you knew it before your accident?**

**A: Correct.**

Q: Did your daddy know that?

A: Not that I'm aware of, no, sir.

Q: Did your mama know that?

A: No, sir, not that I'm aware of.

Q: Did the other three guys know it?

A: Not that I'm aware of.

Q: So, you're saying that you're the only one that knew that it was not engaged before your accident?

A: Correct.

9

Further, Turnipseed testified, on the day of the accident he had been the one who attached the Stearns

tube to the tow rope with the hook. Turnipseed had been riding tubes for two to three years before

his accident and estimated that he had done so more than twenty separate times.

Regarding written warnings on the Stearns tube to which the universal snap hook was

attached, Turnipseed testified:

> Q: Now, I take it if you had read these instructions, you could have understood them, couldn't you?
> A: Yes, sir.
> Q: So, if it says never use a metal clip to connect your tube to the tow line, you'd know not to do it, wouldn't you?
> A: Yes, sir.
> Q: I take it your mother was with you at the hospital?
> A: Most of the time, yes, sir, as far as I can recall.
> Q: I understand – do you remember if your father was there first?
> A: I think mom rode with me in the ambulance, but a bunch of people were there when I got there.
> Q: Do you know why a decision was made to use the tow hook or metal clip?
> A: Yes, sir.
> Q: Who made that decision?
> A: That day.
> Q: Yes, sir.
> A: I did.
> Q: And why did you do that?
> A: Because it's safe.

---

Q: And then you're also then saying that you thought that the rope couldn't come off?
A: Right.
Q: And what about the attachment?
A: Right.
Q: So, it was your thinking as you looked at the tow hook and saw that it was not engaged, that it wasn't a problem because the rope and the attachment could not come out?
A: Correct.
Q: Do you have a judgment as to what caused it to not be engaged?
A: No, sir.
Q: Do you have any indication that when it was purchased, it was like this was as it is now, not engaged?
A: No, sir.

Q: All right. Who had told you to do it this way before that day?

A: I don't understand.

Q: Well, who— I know your father had participated in this decision-making process, right?

A: I think so.

Q: Did y'all discuss why y'all would use a tow hook?

A: Well, he just told me to use it, because it's safer than tying the rope to the end of the thing.

Q: And why did he say that?

A: Because it has more pull and it can withstand more. It has more towing capacity, I guess is what you say.

Plaintiff's father allegedly purchased the universal snap hook from Academy Sports in Trussville. He allegedly was looking for a marine-type hook that was adequate for the purpose of boating and tubing. The Attwood hook was selected, Doug Turnipseed testified, because it was advertised as a marine tow hook (the packaging stated it was for use on "tow ropes.") He testified that its packaging identified it as an Attwood product.[6]

According to Libby Turnipseed, plaintiff's mother, she was excited when her husband brought the Attwood hook home because he had found a marine hook for towing. Mrs. Turnipseed was delighted to know that a hook was going to be safe for towing tubes. The Turnipseeds' main reason for buying the universal snap hook, Libby Turnipseed stated, was that a friend of theirs had been slung into a pier and paralyzed, and Mrs. Turnipseed always feared that the rope would come undone or not be tied properly to the inner tube. She thought a clip would be much safer. Libby Turnipseed was not aware that the snap hook did not fully engage, but if she had know that, she would have been afraid the rope would come off the hook. She had never really noticed the sharp point in the hook. There wasn't any warning on the package about the hook's sharp edges.

---

[6] Plaintiffs have not been able to produce any documents specifically referencing the purchase of the hook and do not have the packaging in which the hook came.

Plaintiff's mother believes that the Attwood packaging (1) needs to state that it's not safe for human use and (1) is misleading because it implies that the hook is for marine towing in general. Mrs. Turnipseed sees no reason that the hook's edges have to be so sharp.

Regarding the warnings on the Stearns tube and the Attwood hook, Mrs. Turnipseed testified:

> Q: If you had read the warning on the inner tube, the section about metal hooks, would you have understood it as some type of warning against humans being injured?
> A: Say it again. If I had read –
> Q: On the inner tube, you know, with the language on the inner tube –
> A: Uh-huh.
> Q: – would you have taken that as a warning against human injury?
> A: No.
> Q: Would you have seen it as a concern about tearing or cutting of flesh?
> A: No. I would have been like for maybe that little, black strap thing, that it might have ripped it out or something.
> Q: If there had been a warning on the Attwood product to not lift or tow humans, would you and Doug have paid attention to it?
> A: Sure.
> Q: How do you know that?
> A: Because if it says don't use for humans, then we wouldn't have used it.
> Q: If some warning had appeared on the packaging concerning sharp edges, would that have made any difference to you on the use of the product . . . .
> A: Yes.
> Q: How do you know that that would have made a difference to you?
> A: I would have paid more attention to what was sharp and being sure that it was not going to interfere with anything or come in contact with anything if it was sharp.

Mr. Turnipseed participated in hooking the metal hook on the tube. He said that any warning on the tube itself regarding the metal clip was very difficult to find since it was buried in a number of other instructions. Specifically, Turnipseed testified:

> Q: At any time have you gone back and read the instructions on the tube that was involved in his accident?
> A: I read them when I was in his office (indicating). That was the first time I had ever read them.
> Q: Did you have any trouble understanding the instruction not to use a metal clip to hook it to the tube?

> A: I understand that it said not to use a metal hook.  I asked David twice where it
> was, and then he finally showed me that it was buried in all the warnings on the tube.
> So it did say "Do not use a metal hook," and I thought, "Well, not using a metal hook
> on there, I guess it would tear out the – where it hooks to.
> Q: Okay.  But as I understand it, then – let me make sure that I understand that
> answer.  You do agree that once you read it, you understood that you probably should
> not have used a snap hook like Exhibit 8?
> A: Yes.

Both Turnipseed's father and mother testified that after reviewing (post-accident) the warning

affixed to the Stearns tube, they understood that a metal clip should not be used to affix the tow rope

to the tube.

The injury to plaintiff's leg was an open avulsion injury to the posterior popliteal fossa and

half musculature of the right leg.  *See* Report of Operation, Exhibit 1; Dr. William Stewart ("Dr.

Stewart") Dep. pp. 15-20.[7]  This injury has resulted in permanent impairment and complete loss of

half of the neurologic function below the level of plaintiff's left knee, causing significant functional

changes and deficits.  *See* Northeast Orthopedic Clinic letter of January 22, 2003; John Turnipseed

Dep. at pp. 140-144.

Stewart testified that he could see how the hook with its sharp point could "easily produce

that kind of injury.  He described the design as follows:

> [I]f it hits against something, it's going to open. . . . . Although this area here
> (contact point on body of hook) does not present exactly a sharp point, it is
> at least a very prominent point and if it catches on the fleshy part of a person's
> body or other object, it is going to hook you . . . . [T]hat's a pretty sharp barbed
> edge.  If that cocks you really good at a high speed and if you have a dig on the
> fleshy part of your body, it could probably easily produce that kind of injury.

Plaintiff is a twelfth grader at Southside High School, an honor student, and a scholarship-

level golfer.  He recently returned to playing competitive golf but continues to have physical

---

[7] Dr. Stewart was the orthopedic surgeon who operated on plaintiff's leg.

problems in doing so.

E. Wayne McCain ("McCain"), a licensed professional engineer, submitted a report on behalf of plaintiff that plaintiff's use of the snap hook in this manner was foreseeable since the product was intended to be used (and was advertised for use) on tow lines.[8]  According to McCain, Attwood knowingly distributed the product in recreational and sporting goods retail locations, and the engineers at Attwood should have known or presumed that towing humans was a likely use of the product.  In McCain's opinion, this knowledge would trigger Attwood's responsibility either to appropriately design the product with basic human safety issues in mind or to adequately warn against human use.

McCain summarized his findings as follows: (1) Attwood failed to meet the requirements of the hierarchy of engineering[9] and/or professional engineering principles; (2) Attwood failed to deter foreseeable unsafe usage; (3) Attwood failed to redesign the product to eliminate or guard against points of potential injury; and (4) Attwood failed to adequately warn against a foreseeable and avoidable injury.

McCain's proposed alternative designs included: (1) blunted smooth connections and locking teeth/engagement points; (2) screw-on guard; and (3) spring-loaded guard over engagement point.  Also, McCain opined, a warning could easily and cheaply have been placed on the product's packaging or the product itself.  While the hook was sold and marketed as a marine product, McCain

---

[8] McCain's expert testimony is subject to defendant's motion to exclude, described *infra*.

[9] According to McCain, the hierarchy of engineering is a set of steps used to design a product that is acceptable and does the job you expect it to do.  Additionally, the hierarchy of engineering determines what dangers are involved, redesigns the product to eliminate those dangers, or guards/warns/instructs against those dangers.

testified, it could have had a number of other uses.  While not a human factors expert per se, as a mechanical engineer McCain is required to specify when warnings must be on a product, review the warning, and say whether the warning is acceptable or unacceptable.  Other than the general principles mandated by the hierarchy of engineering, McCain could not locate standards specifically referencing the universal snap hook.

According to McCain, the snap hook appeared to be slightly stressed, and since it did not have a guard, that mode might increase injury risk.  McCain would not agree that the hook as is was in "failure" mode.  McCain believes that the failure to apply standard and general engineering principles resulted in this injury, and even if this is the only time anyone has been injured by the Attwood hook, that is one time too many.  Although McCain prefers a guard, he stated, blunting the ends would diminish the cutting effect on the Attwood device.  McCain testified that the only utility of a sharp edge is to give the parts something to lock onto which could be accomplished by designing the product with blunt ends, having a spring load pulling it together, and having it come back to two flat surfaces.  McCain submitted examples of blunted end marine hooks in use in the industry.

According to McCain, the locking gate would take a few more seconds to utilize but would be very short.  McCain sees no difference in utility between his proposed alternatives (with guards) and the snap hook (without a guard).  In McCain's opinion, it is foreseeable for manufacturers of snap hooks to know that they could be connected to an inner tube.  When asked if the warning on the Sea Sense product was adequate, McCain pointed out that it was better than no warning at all.  McCain also stated that the warning should have been included on the device as well as the package.  According to McCain, the Attwood snap hook or any other similar hook being used for towing humans would be defective.  McCain stated his belief that information on the Stearns tube would

15

not have any effect in regards to Attwood's responsibility for the universal snap hook itself. The instruction on the Stearns tube, McCain contends, refers to the tube not the snap hook. For a warning to be considered effective, McCain opines, it has to be on the product itself, not on another product.

The Attwood catalog warning, McCain states, is ineffective because purchasers of the product usually do not see the catalog. According to McCain, placing a warning directly on the snap hook is feasible. McCain would expect any engineering personnel to meet the hierarchy of engineering mandates as well as to design safe products. According to McCain, hierarchy of engineering principles are not limited to boating but instead apply to all products, product designs, product uses, etc.

McCain states that nip point issues, contact area, sharp edge issues, and guarding principles/design cross over all engineering fields and that it does not require a marine expert to understand the dangers of not applying the standard guarding principles. By McCain's account, a manufacturer must expect that the consumer will not consult designers regarding a product's use, which is why the hierarchy of engineering is employed to design a safe product. The fact that an inner tube found on the market contains a reference to metal hooks, McCain testified, does not negate Attwood's duty to guard or warn. Again, McCain states, there is a guard that could have been applied to the product in a reasonably economical fashion, and warnings on the packaging could have been done for very little cost. Warnings stamped automatically on a product, particularly after the assembly line has been retooled, McCain stated, can be done very economically. Finally, McCain contends, plaintiff's use in towing should have been readily foreseeable to Attwood's engineers, since the product advertises use on a tow rope.

16

Defendant's expert, Kenneth Smith ("Smith"), P.E., agrees that general engineering principles apply in the absence of a particular standard and believes that part of safety practices is to identify and evaluate the severity and foreseeability of a product hazard. Smith also agrees that the manufacturers and designers should consider not just how instruction manuals say the product should be used but also foreseeable uses by people. According to Smith, where feasible, all hazards should be eliminated, and where it is reasonable to eliminate a hazard by design, it should be done. Where hazards cannot reasonably be eliminated, Smith testified, they must be guarded against, taking into account the product's utility.

Smith agrees that one of the purposes of guarding is to protect against human imperfection, including inattention. Smith admits that human imperfection must be considered in designing a product, and the designer should consider operator error being foreseeable. A designer has a duty to use available standards, guidelines, and engineering techniques to design a safe product. *See* Smith Dep. at 55. When hazards are identified, either the product must be redesigned to eliminate those hazards or the company must guard or warn against those hazards.

Some mechanical engineers, Smith statess, would be versed in basic engineering principles in regard to safety design/warnings and that basic guarding and warning principles must be adhered to when products will be distributed to the general public. Additionally, Smith opines, it is feasible to design a universal snap hook with blunted or rounded edges, although Smith believes that it would increase the chances of lines getting caught in the surfaces where the two points meet.

Smith believes that it is foreseeable to Attwood that people would use the universal snap

17

hook to tow devices that contain persons.[10] Additionally, Smith stated, it is foreseeable to engineers that the gate is sharp enough that if it were used improperly, it would cut someone. Further, Smith opined, is reasonably foreseeable for Attwood to know the product would come into contact with human beings.

Smith believes that it is an appropriate use of the Attwood product to tow devices containing humans.[11] According to Smith, warnings on the packaging and on the product itself could be done economically. In Smith's opinion, the warning on the Stearns tube concerning metal hooks was not for the purpose of warning against a hazard like plaintiff's accident but rather against what might happen when a line was stretched with a metal clip attached, thereby launching the line with the metal clip on it back towards the boat. Most purchasers of Attwood products, Smith stated, would likely not have the catalog.

Expectations regarding who would be in a position to receive a warning, Smith contends, would factor into decisions on how warnings should be disseminated. Regarding the hierarchy of engineering methodology, Smith disagrees with McCain. While McCain believes that the hierarchy of engineering is a foregone conclusion that applies to every product and engineer, Smith believes

---

[10] The court notes additional testimony from Smith:

*Q: Is it foreseeable – was it foreseeable in your opinion to Attwood that the sharp points on this universal snap hook created a potential cutting hazard or injury hazard to a consumer?*
A: No, I don't think it was reasonably foreseeable.

[11] The court provides a relevant excerpt from Smith's deposition:

*Q: Is it reasonably foreseeable of Attwood that the product would be used to tow devices that contained persons?*
A: I think that's an appropriate use of this product. So yes, it's foreseeable.

it is more of a suggestive process or engineer's judgment call based on circumstances.

According to plaintiff, there are marine hook products on the market that apply warnings to their packages, and there are also products intended for marine usage that have blunted ends.[12]

On May 29, 2003, Turnipseed, through his mother and next friend Libby Turnipseed, filed suit in the Circuit Court of Etowah County, Alabama against Attwood, claiming that defendant manufactured, designed, assembled, marketed, and/or sold the universal snap hook which allegedly caused Turnipseed's injury. The complaint further alleged that the universal snap hook was defective and unreasonably dangerous and failed to function properly. The following claims appear in the complaint: AEMLD; breach of the warranties of merchantability and fitness for particular purpose; and negligent failure to inspect, test, design, and warn. On June 30, 2003, Attwood filed a notice of removal based on diversity.

## ARGUMENTS

### I.   Defendant's Motion

#### A.   AEMLD

Any AEMLD claim, Attwood asserts, is barred because the universal snap hook had been substantially changed at the time of Turnipseed's injury. Evidence showing that at the time of purchase the universal snap hook in question was fully closed, i.e., the gate completely engaged and covering the tip of the hook, defendant asserts, proves fatal to the AEMLD claim. Turnipseed testified that prior to this accident the hook had partially sprung open, leaving the gate no longer engaged and covering the tip of the hook.

---

[12] This court only found reference to two such products in plaintiff's submissions – the Sea Sense hook and the Wellington hook.

Attwood relies on *Atkins v. American Motors Corp.*, 335 So. 2d 134 (Ala. 1976), which rejected a "no fault" or "strict liability" approach in products defect cases and allowed the fault element to be met by demonstrating that the manufacturer marketed a product which was unreasonably unsafe. According to defendants, *Atkins* requires the plaintiff to demonstrate that the product "was expected to, and did, reach the user or consumer without substantial change in the condition in which it was sold." *See Sapp v. Beech Aircraft Corp*, 564 So. 2d 418, 420 (Ala. 1990)("The burden of proving that the product was in a defective condition at the time it left the hands of the seller is upon the plaintiff. Unless evidence can be produced that will support the conclusion that it was defective when it left the hands of the seller, the burden is not sustained.")

Attwood argues: "Had the gate of the universal snap hook been fully engaged at the time the tube struck Turnipseed, he would not have been injured. Turnipseed's father purchased the hook with its gate in a fully engaged condition. Consequently, it would be contrary to the fault basis of the AEMLD to hold Attwood liable for an injury which occurred as the direct result of a condition for which it was not responsible."

**B.      Failure to Warn**

According to defendant, this claim is fatally flawed because Turnipseed failed to read warnings provided on the Stearns tube to which the universal snap hook was attached. The pertinent warning, Attwood asserts, read: "Never use a metal clip to connect your tube to tow line." The Turnipseeds – mother, father, and son– all admitted that they did not read this warning but as a general proposition it is important to read and comply with warnings and instructions provided with a product. When shown the warning during their depositions, defendant notes, the Turnipseeds all agreed that they understood it. However, Attwood avers, the Turnipseeds contend the universal snap

hook itself and/or its packaging should have warned that the product was not to be used to tow humans.

Here, Attwood asserts, plaintiff's failure to read and heed warnings precludes as a matter of law a finding that the defendant's alleged failure to warn proximately caused the plaintiff's injury, relying on *Deere & Co. v. Grose*, 586 So. 2d 196, 198 (Ala. 1991). In *Deere*, the Alabama Supreme Court reversed a verdict for a plaintiff in a lawsuit seeking damages from Deere under theories of AEMLD and "negligent failure to warn" arising out of the death when a tractor manufactured by Deere rolled over and crushed its operator.[13]

### C.   Breach of Warranty Claims

Plaintiff claims breaches of the implied warranty of merchantability and the implied warranty of fitness for particular purpose. Ala. Code Section 7-2-314 defines the former as follows:

> (2) Goods to be merchantable must be at least such as:
>
> (a)   Pass without objection in the trade under the contract description; and
> (b)   In the case of fungible goods, are of fair average quality within the description; and
> (c)   Are fit for the ordinary purposes for which such goods are used; and
> (d)   Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved;

---

[13] The *Deere* court observed:

> We first address Ms. Grose's negligent-failure-to-warn-adequately claim. The necessary elements for recovery under a negligence theory are duty, breach of that duty, proximate causation, and injury/damage . . . Accordingly, Ms. Grose must prove that Deere failed to warn adequately of the dangers associated with the use of the tractor and that its failure to do so proximately caused the injury of which she complains. Specifically, as concerns proximate cause, a negligent-failure-to-warn-adequately case should not be submitted to the jury unless there is substantial evidence that an adequate warning would have been read and heeded and would have prevented the accident....

*See also Gurley v. Am. Honda Motor, Inc.*, 505 So. 2d 358 (Ala. 1987).

21

and

(e)    Are adequately contained, packaged, and labeled as the agreement may require; and

(f)    Conform to the promises or affirmations of fact made on the container or label if any.

Ala. Code Section 7-2-315 defines the latter as:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under Section 7-2-316 an implied warranty that the goods shall be fit for such purpose.

Here, Attwood argues, essential elements of both warranty claims are missing. For the warranty of merchantability, Attwood contends, Turnipseed cannot demonstrate that the universal snap hook is not "fit for the ordinary purposes for which . . .[it][is] used" because Turnipseed has not demonstrated that the universal snap hook was intended to be used as a means of attaching an inner tube and tow rope. Regarding fitness for particular purpose, Attwood asserts, Turnipseed can demonstrate neither that Attwood knew of the purpose for which the Turnipseeds purchased the hook nor that the Turnipseeds relied on Attwood's "skill or judgment to select or furnish suitable goods." On the contrary, defendant notes, Mr. Turnipseed testified that he purchased the Attwood hook from a sporting goods store's display rack without inquiring about the proper use of the hook. *See Barrington Corp. v. Patrick Lumber Co., Inc.,* 447 So. 2d 775 (Ala. Civ. App. 1984).

Finally, Attwood argues, both warranty claims require substantial evidence that the injury was caused by a breach of the implied warranties. *Id.* According to defendant, plaintiff cannot demonstrate the existence of proximate cause, given the following evidence: (1) plaintiff had noticed before the accident that the gate of the Attwood hook did not engage the end of the hook; (2) plaintiff's injury occurred when the exposed end of the hook point was pulled into his leg; and

22

(3) at the time of purchase, the hook had not sprung open -- the gate engaged and covered the hook point.  According to Attwood, no one knows why the hook sprung open. Attwood relies upon Committee Comments to the pertinent Alabama Code provisions as demonstrating that the condition of the hook as it existed immediately prior to the accident prevents plaintiff from establishing proximate cause.[14]

### D.   Turnipseed's AEMLD Claim Is Barred by His Contributory Negligence

Again, defendant highlights Turnipseed's deposition testimony regarding his awareness that the hook which injured him had sprung into an open position prior to his accident, thereby exposing the pointed end of the gate.  Despite this knowledge, defendant argues, Turnipseed proceeded to use

---

[14] Comment 13 to § 7-2-314 states:

In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of warranty was the proximate cause of the loss sustained. **In such an action an affirmative showing by the seller that the loss resulted from some action or event following his own delivery of the goods can operate as a defense.**  Equally, evidence indicating that the seller exercised care in the manufacture, processing or selection of the goods is relevant to the issue of whether the warning was in fact broken.  **Action by the buyer following an examination of the goods which ought to have indicated the defect complained of can be shown as a matter bearing on whether the breach itself was the cause of the injury**.  (Emphasis added).

Comment 5 to § 7-2-715 states:

Subsection (2)(b) states the usual rule as to breach of warranty, allowing recovery for injuries "proximately" resulting from the breach.  Where the injury involved follows the use of goods without discovery of the defect causing the damage, the question of "proximate" turns on whether it was reasonable for the buyer to use the goods without such inspection as would have revealed the defects.  If it was not reasonable for him to do so, **or if he did in fact discover the defect prior to his use, the injury would not proximately result from the breach of warranty**. (Emphasis added).

the product. Additionally, defendant notes, the Stearns tube contained an express warning not to use a metal clip to attach a tow rope to the tube. The defense of contributory negligence bars Turnipseed's claims, defendant asserts, since plaintiff had knowledge of the condition which caused his injury, appreciated the danger, and failed to exercise reasonable care by placing himself in the way of that danger. *See Watters v. Bucyrus-Erie Co.*, 537 So. 2d 24 (Ala. 1989)(listing elements of contributory negligence defense).

Contributory negligence in using a product, defendant argues, provides a complete defense to the manufacturer in an AEMLD action. *See Gen. Motors Corp. v. Saint*, 646 So. 2d 564, 568 (Ala. 1994)(finding "plaintiff is contributorily negligent in handling a defective product when he or she fails to use reasonable care with regard to that product.") In the *Saint* case, defendant argues, the Alabama Supreme Court reversed and remanded a jury verdict for the plaintiff in a suit against General Motors in which the plaintiff contended that her seat belt was defective. The judgment was reversed because the trial court refused to charge the jury on contributory evidence despite evidence to this effect. *See also Campbell v. Cutler Hammer, Inc.*, 646 So. 2d 573 (Ala. 1994); *Dennis v. Am. Honda Motor Co., Inc.*, 585 So. 2d 1336 (Ala. 1991).

## II.   Plaintiff's Response

### A.   The Claim is Not Barred in this Application Because the Universal Snap Hook Was Not Substantially Changed.

The AEMLD provides for liability if a defendant puts on the market a product which is not reasonably safe, and the plaintiff is injured as a result of the contemplated use of that product. *See Rudd v. Gen. Motors Corp.*, 127 F. Supp. 2d 1330 (N.D. Ala. 2001). The nature of the conduct of the plaintiff in using the product is ordinarily a factual issue for the jury. *See Bonner Welders, Inc.*

*v. Knighton*, 425 So. 2d 441 (Ala. 1982).

According to Turnipseed, the fact that the teeth did not meet precisely into the hook, i.e., the points didn't meet up 100%, before the accident did not change the essential utility of the device as a hook. After seeing the gate sprung open, plaintiff stated, his concern was that the rope would come out. There are no instructions on the product not to use it if the points don't meet up 100%. Pulling on the hook so that the contact points don't meet 100%, Turnipseed asserts, is foreseeable to Attwood, as demonstrated by its testing of hooks for tensile strength to the point that they pull apart. As such, plaintiff contends, it is not a "substantial" change but rather an anticipated one that makes it obvious that the sharpness of contact points is an issue.

Under Alabama law, plaintiff argues, the mere fact of a product's alteration or modification does not relieve the manufacturer or seller of liability if the alteration or modification did not, in fact, cause the injury or if it was reasonably foreseeable to the manufacturer or seller. *See Dickerson v. Cushman, Inc.*, 909 F. Supp. 1467 (N.D. Ala. 1995)(emphasis added).

According to plaintiff, whether or not the points met 100%, it was obvious and foreseeable to Attwood that humans would be exposed to the sharpness of contact points on the universal snap hook. Plaintiff argues that the hazards of exposure of those contact points is foreseeable in the industry, as demonstrated by: the alternative designs of marine hooks with blunted points, the packaging warnings in the industry, and Attwood's warning in its catalog.

Turnipseed deems the design defect at issue in this case to be the hook's "razor sharp edges" (plaintiff's description) without any guarding or warning. According to plaintiff, this defect exists independently of whether the gate engages fully. The sharp points present at all times on the hook, plaintiff contends, satisfy the requirement of the product being in a defective condition at the time

25

it left the seller.  Furthermore, Turnipseed argues, the foreseeability of the change makes the sharp

points all the more defective.  Whether locking 100% or not, plaintiff contends, the gate likely would

have to have fully been pushed open (thereby exposing the sharp points) to have snagged John's leg

in the manner it did.  *See* Dr. Stewart Dep. at 17-18.  Therefore, plaintiff argues: "[D]efendant's

assertions regarding the slight pull in the hook causing the gate not to meet entirely is likely a non-

issue at any rate."

Turnipseed quotes *Rudd* as follows: "For purposes of the . . . AEMLD, a 'defect' is that

which renders a product unreasonably dangerous, i.e., not fit for its intended purpose; it makes no

difference whether a product is dangerous by design or defect, the important factor is whether it is

safe or dangerous if a product is used as it was intended to be used.  However, the danger may be

obviated by an adequate warning."

### B.    Attwood's Failure to Warn is a Basis of Liability.

An AEMLD failure to warn case requires proving: (1) the defendant had a duty to warn

plaintiff of a product's danger when used in its customary manner; (2) defendant's warning breached

that duty because it was inadequate; and (3) the breach proximately caused plaintiff's injury.  *See*

*Strickland v. Royal Lubricant, Inc.*, 911 F. Supp. 1460 (M.D. Ala. 1995).  A warning must be

reasonable under the circumstances, not the best possible warning.  *Id.*  It is not necessary to warn

against every danger, only to acquaint the user of a danger of which he is not aware.  *Id.*  Plaintiff

reiterates that the hook and its packaging lacked warnings.  Additionally, plaintiff notes, similar

products in the marine industry contained warnings.

According to Turnipseed, he was not cognizant of the sharpness of the hook's points, since

he had not been exposed to them previously.  Again, Turnipseed asserts, Attwood cannot rely on

26

warnings on the Stearns tube to satisfy its obligations to warn of its own product's dangers. Plaintiff deems meritless or at least a jury question defendant's argument that any warning on its hook would not have been heeded since defendants did not heed the warning on the Stearns tube. According to the Turnipseeds' own testimony, plaintiff argues, they were looking for and reading the packaging on hooks to find one that would be appropriate and safe as a general towing device. Furthermore, Turnipseed contends, references to metal hooks do not appear on every tube (and did not appear on the tube which plaintiff was using when the accident occurred). Additionally, plaintiff argues, the metal hook warning on the Stearns tube was "buried in a laundry list of fourteen instructions."

Moreover, Turnipseed asserts, the Stearns tube's instruction regarding metal hooks was not intended to cover the hazard of sharp points on hooks but rather the situation where a hook pulled through the tube strapping and was launched back towards the boat. *See* Smith Dep. at 106-107.[15] The Turnipseeds testified that this latter interpretation comported with their interpretation of the tube's metal hook instruction (formulated after the accident). Plaintiff argues: "It is somewhat disingenuous for Attwood to defend the lack of use of a warning on a product by claiming that someone else did it for you, especially with the use of warnings present on other product packaging in the marine hook industry."

Where there is a duty to warn, the failure to warn in and of itself makes a product "defective" under the AEMLD. *See Chase v. Kawasaki Motors*, 140 F. Supp. 1280 (N.D. Ala. 201). Under Alabama law, "the existence of a duty to warn and adequacy of a warning are questions of fact for the jury." *See Tool v. McClintock*, 999 F.2d 1430 (11th Cir. 1993).

---

[15] Smith further testified: "But the end result is the use of a metal clip or snap or fastener of any kind is prohibited or is a practice that's not recommended and is in fact warned against by the tube manufacturers; certainly both the tube manufacturers involved in this accident."

## C.    The Breach of Warranty Claims are Appropriate.

According to plaintiff, McCain's deposition testimony has demonstrated proximate cause for purposes of breach of merchantability because the sharp contact points of the hooks created unfitness for its ordinary purpose. Plaintiff asserts that both parties' experts have agreed that the use (towing a person) was foreseeable. Again, plaintiff observes, this was a "universal" snap hook knowingly sold by Attwood in a sporting goods store, with the stated use of "tow lines." According to plaintiff, nothing exotic was being done with the hook in question on the day of the accident. Turnipseed again highlights the warning in the Attwood catalog, emphasizing that such warning was not distributed in a location where most consumers could find it as well as the existence of competitors' warnings on similar products.

Relying on *Dillard v. Petway Corp*, 719 So. 2d 188 (Ala. 1988), plaintiff contends, the "no causal relation" defense is not available to Attwood. *Dillard* provided: "If the seller of a product has an opportunity to inspect the product that is superior to the opportunity of the consumer, or has knowledge of the product that is superior to that of the consumer, then it is not entitled to a 'no-causal-relation' defense, even where it did not contribute to the defective condition of the product." Plaintiff argues that Attwood was aware of the particular purpose, i.e., marine towing, for which this product may be used, and there is evidence that the injury was caused by the breach. According to Attwood, any dispute regarding causation would be a jury issue. The burden of product identification, plaintiff contends, may be met through circumstantial as well as direct evidence. *See Strickland v. Royal Lubricant Co., Inc.*, 911 F. Supp. 1460 (N.D. Ala. 1995).[16]

---

[16] Specifically, this court notes, *Strickland* stated:

> The defendant, however, argues that the plaintiff cannot survive summary

28

Turnipseed had no awareness or appreciation of the hook's sharp point or that it could snag his leg, plaintiff argues, despite his awareness prior to his accident that the universal snap hook gate did not close 100%.

**D.     Plaintiff's Conduct Does Not Rise to the Level of Contributory Negligence Acting as a Bar Under the AEMLD.**

Turnipseed did not fail to exercise reasonable care after having been fully apprised of the danger in this case, plaintiff asserts, because he did not substantially appreciate the specific danger. Plaintiff relies on *Goree v. Winnebago Industry, Inc.*, 958 F.2d 1537 (11th Cir. 1992) for the proposition that contributory negligence issues are "normally a jury question, and 'the Court must be careful not to construe the phrase 'intended use' so strictly as to actually resolve questions of contributory negligence or assumption of risk without submitting those issues to the jury.'" (citing *Brownlee*, 641 F.2d at 400)(quotation omitted).  For AEMLD purposes, plaintiff argues, the use is intended if it is reasonably foreseeable by the manufacturer. *See supra, Dickerson*.  Turnipseed also relies on *Bowden, ex rel. v. Wal-Mart Stores, Inc.*, 124 F. Supp. 2d 1228 (M.D. Ala. 2000).[17]

_____

judgment because he has failed to submit "substantial evidence" that Royco 782 is the product to which he was exposed. Def.'s Reply Br. in Supp.Mot.Summ.J. at 27. The court finds this argument without merit. The defendant is correct that product identification is an element of causation and a "threshold requirement" in any products liability case. Sheffield v. Owens-Corning Fiberglass Corp., 595 So.2d 443, 450 (Ala.1992). The plaintiff may meet his or her burden through "circumstantial as well as direct evidence."

[17] The court provides an excerpt from *Bowden*:

The "open and obvious" defense requires proof of three elements: (1) knowledge by the plaintiff of the condition; (2) appreciation by the plaintiff of the danger or risk posed by that condition; and (3) a voluntary, affirmative exposure to the danger or risk. See *Rodgers v. Shave Mfg. Co.*, 993 F.Supp. 1428, 1437 (M.D.Ala.1998) (quoting *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 470 (11th Cir.1993) (applying Alabama law)). "A general awareness of danger is not sufficient to establish that one has

According to plaintiff, a mere heedlessness to danger is insufficient standing alone to warrant a finding of contributory negligence as a matter of law under the AEMLD. *See Hicks v. Comm'l Union Ins. Co.*, 652 So. 2d 211 (Ala. 1994). To sustain a finding of contributory negligence as a matter of law under the AEMLD, plaintiff argues, evidence must show that "plaintiff put himself in danger's way, that he appreciated the danger confronted and that the appreciation of danger was a conscious appreciation at the moment the incident occurred." *See Sears v. Waste Processing Equipment, Inc.*, 695 So. 2d 51 (Ala. Civ. App. 1997). By plaintiff's account, John Turnipseed's testimony does not meet this requirement. According to plaintiff, John Turnipseed testified that he was aware that the hook did not meet up completely; however, he did not notice or appreciate the sharpness of the ends or that it could become a cutting hazard. *See* Turnipseed Dep. 114-117; *See also* Mr. Turnipseed Dep. 39.[18] Defendant's use of the term "freak accident" in reference to Turnipseed's injury, plaintiff argues, further underscores the invalidity of any contention that the hook was an open and obvious danger.

Plaintiff denies defendant's insinuations about some lack of safety regarding the choice of

---

assumed the risk of injury." Id. The analysis is a subjective one, and the factfinder is generally who determines whether the plaintiff had actual awareness of the risky condition. See id. Summary judgment is inappropriate if circumstantial evidence creates a genuine issue of material fact as to whether, at the time of the accident, Plaintiff was specifically aware of the nature and extent of the danger, and whether he assumed the risk of injury from using the product. See id.

[18] However, defendant points out (and the court confirms), pages 114-117 of plaintiff's deposition (cited by plaintiff) do not appear to contain a statement by plaintiff that he did not notice or appreciate the sharpness of the ends or that it could become a cutting hazard.

Plaintiff has correctly cited Mr. Turnipseed's (plaintiff's father's) deposition, in which Mr. Turnipseed testified that <u>he</u> never noticed any sharp point on the hook itself.

tow rope, the speed of the boat, and the boat circling back across its wake to create waves.[19]  Even assuming *arguendo* that such facts are accurate, plaintiff argues, defendant's contributory negligence defense should still not prevail, since that defense is limited to plaintiff's negligence or failure to use reasonable care in actually using the product and does not cover the plaintiff's negligence in causing the accident that led to his injury.  *See Culpepper v. Weihrauch*, 991 F .Supp.1 397 (M.D. Ala. 1997).  Further, plaintiff contends, *General Motors v. Saint* does not help Attwood, since the procedural posture of that case is different.  According to plaintiff, *Saint* addressed the necessity for a jury charge on the issue of plaintiff's failure to use reasonable care.

### E.      The Hazards Were Foreseeable in the Industry.

Plaintiff argues that the warnings used by Attwood's competitors, Sea Sense and Wellington, demonstrate awareness in the marine industry of the foreseeable use of snap hooks to tow humans. In this case, plaintiff contends, Attwood's superior knowledge of its product was not passed along to Turnipseed in this case.  Moreover, plaintiff argues: "It was certainly not expected that such superior knowledge and a warning as a result of that superior knowledge would trickle down to the general consumer by a warning only in the catalog."

### F.      Granting Summary Judgment is not Appropriate in this Case Since Alternative Feasible Designs Are Available and Warnings Exist in the Industry.

A manufacturer can be liable for injuries resulting from an inherently dangerous product if the plaintiff can prove that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the product.  *See Connally v. Sears, Roebuck & Co.*, 86 F. Supp. 2d 1133

---

[19] While these issues may have arisen in the context of depositions, the court notes, it does not appear to have been discussed in the facts section of defendant's brief in support of summary judgment.

31

(S.D. Ala. 1999); *see also McPhail v. Mitsubishi Motor Mfg. of Am., Inc.*, 80 F. Supp. 2d 1309 (S.D. Ala. 1997). Plaintiff again emphasizes the use of guarding/blunt ends and warnings used in the industry. Plaintiff then argues: "The testimony of defendant expert Smith does not obviate the design change claimed by stating that the alteration of design by use of guards and/or blunting creates a different product, because that testimony is not tantamount to saying there is no utility, especially with applications by other manufacturers."

Finally, Turnipseed argues, McCain's testimony regarding alternative designs and warnings is appropriate and sufficient, despite defendant's *Daubert*-based argument about failure to test McCain's theories. Plaintiff relies on *McGee v. Evenflo Company, Inc.*, 2003 WL 23350439 (N.D. Ga. 2003). According to plaintiff, *McGee* permits actual existing alternative designs in use to substitute for and thus satisfy the testing requirement prescribed by *Daubert*.[20]

---

[20] *McGee*, this court notes, does not appear to stand for the proposition that in all cases evidence of alternate designs in use provides an exact substitute for *Daubert's* testing factor.

Regarding failure to test an alleged defective design, *McGee* held:

> Brown [plaintiff's expert], however, has not conducted substantive tests, taken any measurements, or made any calculations to confirm this assumption [that the product at issue was defectively designed]. Similarly, Brown has made no effort to formulate, identify, or incorporate any accident history evolution information to support his theory that the product is dangerously defective.
>
> [H]ands-on testing or review of data gathered by others may sometimes serve as reliable methodology and may serve as a substitute for actual testing . . . . [I]n this case, Brown did review selected CD-ROMS showing sled tests previously conducted by Evenflo. However, these sled tests primarily involved frontal collisions. Further, Brown has not specifically articulated how these tests show that the design permitting the seat to impact the rear cushion of the back seat following rear-end collisions support his theory of defect."

Further discussion and quotation of *McGee* on the testing issue appears *infra*.

32

III.    **Defendant's Reply**

As a threshold matter, defendant argues:, "the alleged 'sharp point' on the snap hook on which Plaintiff stakes his argument is not the surface of the hook which caused Turnipseed's injury." Defendant relies on an excerpt from Dr. Stewart's deposition. *See* Def. Reply, Ex. 1. According to the defendant, the tip of the snap hook, which pulled in Turnipseed's leg, is not pointed.

Defendant repeats that the universal snap hook had "sprung" open prior to the injury, arguing that this condition caused the injury. When Mr. Turnipseed purchased the hook in question, Attwood asserts, it had not "sprung" open and the gate on the hook fully engaged the tip, thereby completely covering it. Defendant repeats its contention that this change in condition destroys a material element of Turnipseed's *prima facie* case. According to Attwood, its evidence of tensile strength testing on the hook, which involved subjecting samples of the hooks to extreme pulling force until they fail and spring open, reflect that the samples of the hook which were tested did not fail until subjected to loads in excess of 2,000 pounds.

Attwood criticizes Turnipseed's contention that the mere fact that Attwood undertakes this testing indicates that the change in condition of the hook, i.e., the "sprung" condition, was "foreseeable" and thus a change for which Attwood may be held legally liable. On the contrary, Attwood argues, the test results simply show that the samples of the hook retained their integrity until they were subjected to loads in excess of their design strength. In other words, Attwood contends, the "change" in those samples only came about after intentional abuse. In this regard, Attwood relies on *Allison v. McDonnell Douglas Helicopter Systems*, 1995 U.S. Dist. LEXIS 11455 (N.D. Ala. 1995). In that case, the court granted summary judgment for the defendant helicopter

---

manufacturer in a lawsuit which arose out of the Davey Allison crash. The evidence had established that Allison's injuries resulted from the absence of upper torso restraints in the helicopter; that such restraints had been supplied by the manufacturer; and that the restraints were subsequently removed prior to the accident. The plaintiffs argued that because it was "foreseeable" that the upper torso restraints would be removed, such a change was "foreseeable" and should not furnish defendant with an AEMLD defense. However, Judge Guin rejected that argument as follows:

> The court finds plaintiffs' argument regarding foreseeability to be without merit. Under plaintiffs' theory, manufacturers could be held liable in every incident of injury caused by removal of safety equipment by a consumer which was not prohibited by law. Such result is clearly absurd and would contravene the law.

Under Alabama law, Attwood argues, "[t]he failure of a product does not presuppose the existence of a defect. Proof of an accident and injury is not in itself sufficient to establish liability under the AEMLD; a defect in the product must be affirmatively shown." *See Townsend v. Gen. Motors Corp.*, 642 So. 2d 411, 415 (Ala. 1994). Turnipseed cannot meet this burden of proof, Attwood argues, "because his entire theory of liability against Attwood is built around the allegation that his injury was caused by the exposed end of the snap hook, and there is no evidence that such a condition could have resulted without subjecting the hook to loads in excess of design capacity. Since the change in the product cause the injury, Attwood argues, summary judgment is appropriate on the AEMLD claim. *See Williamson v. Tyson Foods*, 626 So. 2d 1261 (Ala. 1993).

In this vein, defendant contends:

> Plaintiff claims in her Response that "[t]he defect is the design [of the hook], whether the gate engages fully or not, of placing razor sharp edges on the hook without there being any guarding or warning." ... In fact the "point" on the

snap hook interlocks with the corresponding surface of the gate in the same manner that two pieces of a puzzle fit together. As a result, unless the gate is sprung, there is no exposed end on the snap hook. Furthermore, the end of the hook itself, which is the surface dug into Turnipseed's leg, is not pointed. The only surface on the hook which could reasonably be called pointed, is the end of the locking gate, which is covered by the bend of the snap hook and did not, according to Turnipseed's doctor, cause his injury..... Regardless, had the gate not been sprung open when used by Turnipseed, the edge would not have protruded and he would not have been injured. The sprung condition of the snap hook was a substantial change in its condition and that substantial change occurred after the snap hook left the control of Attwood....

As further reason for summary judgment on the AEMLD claims, defendant reiterates, (1) Turnipseed cannot demonstrate that a safe, practical alternative to the snap hook design existed at the time of his injury, and (2) Attwood is entitled to the defense of contributory negligence. Regarding the former, defendant argues, McCain's contention that the locking feature of the mountain climbing carabiners should have been incorporated on the universal snap hook has not been shown to be practical in the marine environment. According to Attwood, the mere possibility that this design feature could have been adopted is not sufficient to impose AEMLD liability in the absence of evidence that this design feature could have been practically used. *See Beech v. Outboard Motor Corp.*, 587 So. 2d 447 (Ala. 1991); *Elliott v. Brunswick Corp.*, 903 F.2d 1505 (11th Cir. 1990).

As for contributory negligence, Attwood asserts, while counsel for plaintiff argues that John Turnipseed, Jr. "did not notice or appreciate the sharpness of the ends or that it could become a cutting hazard," the deposition pages cited in the Response do not support that argument. Rather, Attwood argues, plaintiff's father testified that he had not noticed the sharp point, but plaintiff himself said nothing to that effect. Instead, the cited pages show testimony by plaintiff that he saw that the hook was sprung open but believed that this condition would not allow the rope to slip out. *Sears v. Waste Processing Equipment, Inc.*, 695 So.2d 51, 53 (Ala. Civ. App. 1997) found with

respect to a manufacturer's defenses in an AEMLD case:

> The affirmative defenses of contributory negligence and assumption of the risk are viable defenses under the AEMLD. In order to sustain a finding of contributory negligence as a matter of law, the evidence must show that the plaintiff put herself in danger's way, that she appreciated the danger confronted, and that the appreciation of the danger was a conscious appreciation at the moment the incident occurred. In order to establish assumption of the risk as a matter of law, the evidence must show that the plaintiff discovered the alleged defect, was aware of the danger, proceeded unreasonably to use the product, and was injured.

(Citations omitted).

While plaintiff contends that he was not contributorily negligent because he was not "aware" of the specific hazard of the sprung-open hook, Attwood contends: "[H]e was unquestionably aware that the point of the hook was exposed at the time he and his friend began riding the tubes that day. He was not, contrary to the claim in Turnipseed's Response 'merely heedless' of the danger in the sense that he carelessly failed to determine whether a hazard existed. Rather, he saw the exposed hook point and chose to disregard it. Such conduct amounts to contributory negligence and assumption of the risk as a matter of law."

Next, Attwood reiterates, Turnipseed's failure to read and heed the warnings provided on the tube means that the essential element of his failure to warn claim is missing. Had the warning on the tube been heeded, Attwood argues, Turnipseed would not have been injured. Despite plaintiff's argument that "defendant cannot rely on instructions from one product to satisfy its obligations to warn of its own product," defendant contends, the Alabama Supreme Court has held that a failure to warn claim should not reach the jury unless "there is substantial evidence that an adequate warning would have been read and heeded and would have prevented the accident." *See Deere*, *supra*, at 198. According to defendant, the Turnipseeds have not provided such evidence.

36

Finally, Attwood asserts, Turnipseed's contention that a breach of the implied warranty of merchantability can be shown when a product is used for a "foreseeable" purpose and an injury results has no merit. Here, Attwood argues, there is no evidence that at the time of purchase the snap hook was not acceptable for the use specified on its packaging, i.e., "Secures and joins halyard or sails. Use on motor safety lines or tow ropes." Attwood reiterates that there is no evidence that injury would have occurred had the hook not been "sprung" apart.

**DEFENDANT'S MOTION TO EXCLUDE TESTIMONY
OF ELMER WAYNE MCCAIN[21]**

I.     <u>Defendant's Motion</u>[22]

    A.     **Facts According to Defendant**

In 1959, McCain attained a bachelors' degree in mechanical engineering from Auburn. He received no academic honors and no post-graduate formal education. After graduation and army service, McCain worked for his father at McCain Boiler & Engineering until 1987 and now owns the company. However, McCain testified, "it's a company that does nothing, has no employees, does nothing." McCain also owns McCain Industrial Supply Company, which distributes chemicals for use in boilers and cooling towers. Further, McCain receives income from rental property. McCain's primary business is E. Wayne McCain, P.E., Inc., from which he operates his witness practice. He

---

[21] Hereinafter "McCain."

[22] According to defendant, McCain's proffered testimony is unreliable and thus inadmissible under Rule 702 of the Federal Rules of Evidence. Attwood relies upon the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), as extended to engineering testimony in products liability cases in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1998).

attributes maybe fifteen or twenty percent maximum of his income to paid testimony. "For probably 25 years," McCain once owned an inboard/outboard boat, an outboard fishing boat, and a Hobie Cat sailboat, but he does not own them now.  According to McCain's deposition, he had never used a universal snap hook in his boating experience and would only have been exposed to that type of hook as part of the rappelling gear he used in the military.

McCain is certified by the National Academy of Forensics Engineers ("NAFE").  He first became associated with NAFE approximately 25 years ago and last attended a meeting in 2001. Although NAFE distributes letters to its members, it has no publication for general circulation. McCain served as Chairman of the Membership Committee of the NACE and Chairman of the R & D Committee of the National Safety Council (for five years).  He also served on the Welding and Boiler and Pressure Vessel Subcommittees of the American Society of Mechanical Engineers ("ASME").[23]  None of these positions involved "universal safety hooks" or marine products. McCain has no involvement with the marine industry.

When asked in his deposition "what do you say you are an expert in?", McCain replied:

> That's a loaded question.  I review mechanical – I review incidents or
> equipment involved in incidents and determine to the best of my ability
> what engineering failures or what engineering pluses a piece of equipment
> might have.  I have, for forty or fifty years, dealt with mechanical engineering
> and various products manufactured by various manufacturers, and as such,
> have gained a lot of knowledge with respect to not only the standards, rules,
> and regulations but also the manufacture of equipment.  So I can't tell you – if
> it's mechanical engineering and some chemical and electrical engineering, I
> qualify, in my opinion, as an expert in that field.  I will tell you, with question,
> if I do not feel I can –

---

[23] McCain has been a member of the American Society of Mechanical Engineers and the American Society of Safety Engineers for over 40 years.

Attwood highlights McCain's admission that he is not a biomechanical expert and only taught safety courses (1) to McCain Boiler & Engineering Company personnel and (2) in the course of litigation involving the HRT-Cooley Corporation. Neither of these involved marine applications or marine products. McCain has never been retained by a university or a school to teach an engineering course. Of the cases in which McCain testified during 1999-2003, none involved universal snap hooks or marine products. Furthermore, McCain could not recall ever being consulted by the manufacturer of a marine product.

According to McCain's deposition, he admits to not being a human factors expert and not having the expertise to write a warning. McCain has never written a warning for the marine industry or for a product used in a marine application, and he further testified that he had only written warnings in approximately five cases, all involving industrial plants. McCain has not published anything in the last ten years. His previous publications (nearly 15 years ago and none in a scholarly journal) all related to "carbon monoxide, LP gas or gas explosion, and safety, in general." McCain has never served as a consultant for the marine industry or for the manufacturer of a product that could be used in a marine application. Moreover, McCain has never designed any product or warning for a product that was "mass marketed."

In arriving at his expert opinion, McCain reviewed the depositions of the Turnipseeds and the Attwood representatives. McCain knew nothing about the potential characteristics of the snap hook in question. While McCain was told that the snap hook had been manufactured by Attwood, he had no independent knowledge of that fact. McCain admitted that the "gate" on the universal snap hook had not been engaged at the time of Turnipseed's accident and had been in that condition before the accident. McCain was unaware of any other accidents involving universal snap hooks and

39

admitted that he was not surprised to hear that there had never been an injury like Turnipseed's. McCain expressed his intention to write the National Safety Council and advise them of the accident.

At his deposition, McCain produced four hooks that he contended were "safer" than the universal snap hook at issue and could have been used to avoid injury. All but one of these items had been provided by plaintiffs' counsel. McCain's preferred hook was a device called a "locking carabiner" used for rappelling. McCain purchased the carabiner at a sporting goods store from a rack of climbing hardware. McCain had attempted to determine neither the tensile characteristics of the carabiner nor "whether the guard would have reacted under the conditions or not." Although this carabiner had a sharp point like the universal snap hook, he nevertheless preferred the carabiner for its "screw-type guard" that pulled down over the area of the hook so that it could not be used if it did not close.

McCain criticized the universal snap hook for lacking a warning on it or its packaging to the effect that it should not be used when people are involved. In support of this criticism, McCain testified that he had reviewed the packaging for a snap hook manufactured by Sea Sense which stated "not to be used to pull or lift humans." The Sea Sense packaging was provided by plaintiff's attorney, and McCain admitted that he did not know when Sea Sense began placing this warning on its packaging. McCain also pointed to a warning on the Sea Sense website which stated "not for towing or lifting humans" but admitted that the warning was for a "swivel eye snap" and not a universal snap hook. McCain did not know when such warning had been placed on the Sea Sense web page, dated January 10, 2003.

McCain admitted that he had seen warnings written on one of the tubes involved in the accident but professed to be unable to recall what the warning said. McCain also admitted that he

40

did not know which of the two tubes he had examined and did not know whether the other one also

had warnings.  McCain discounted the warning on the one tube because it was part of a  "laundry

list" of warnings.  Attwood provides the following excerpt from his deposition:

Q:    I am trying to make sure I understand your point.  Do you think the warnings should
be fewer?

A:    They should be fewer, more concise, with respect to the tube itself.  And they only
refer to the tube, not to this universal snap hook.

Q:    I take it, then, say, for example, if the tube had fourteen, who makes the
determination to reduce it to seven, for example?

A:    It's up to the manufacturer and the human factors expert that they had working on the
project, not me.

Q:    Wayne McCain is not an expert in that regard?

A:    I would read them if it was on a product that I designed and tell you if in my opinion
they were effective and if they were warnings that should be used.

Q:    There is no doubt in your mind that is a hook, is there?

A:    A hook?

Q:    A hook?

A:    It's a universal snap hook, that's right.

Q:    And there is no doubt in your mind that's a metal clip, is it?

A:    Metal clip?  The clip that closes, you are talking about?  A clip?  What are you
calling a clip?

Q:    Would you understand this [universal snap hook] to be a metal clip?

A:    I understand it to be a universal snap hook.  It's a snap that does act as a clip, I
suppose.

Q:    Do you understand that this could be utilized to be a clip?

A:    I would expect you would call it that.

Q:    Therefore, if you were warned not to use it in that fashion that would be important?

A:    As a universal snap hook or clip, not to pull or lift humans, I would understand it,
yes.

Q:    Or if it told you not to in a particular application, that would be important, wouldn't
it?

A:    Yes.

Q:    If I told you never to use a metal clip, that would be important, wouldn't it?

A:    That would be important, yes.[24]

McCain stated that he had not examined any literature regarding warnings and reiterated that he was

_____

[24] As a reminder, the Stearns tube bore the warning: "Never use a metal clip to connect
your tube to the tow line."

41

not a human factors expert.

      **B.**      **Argument**

Attwood enumerates *Daubert's* list of non-exclusive factors for preliminarily assessing whether the reasoning or methodology underlying the proffered expert testimony is scientifically valid and can properly applied to the facts at issue:

1.      Whether the theory or technique "can be (and has been) tested"
2.      Whether the theory or technique underlying the proffered testimony "has been subjected to a peer review and publication"; and
3.      The known or potential rate of error underlying a particular methodology.

According to Attwood, "McCain has simply volunteered an offhand opinion that Attwood should have mimicked the design of a carabiner used for rappelling down an incline in designing its universal snap hook." Defendant alleges the following flaws in McCain's testimony: (1) McCain pointed to no standards to support his opinion, conducted no marine testing of his proffered design, and offered no observations with respect to how the carabiner design would function in a marine environment; (2) McCain had published very little in technical publications and nothing in the last ten years; and (3) McCain's theory in this case had not been subjected to peer review or subject to any standards or publications.

Attwood relies on three decisions which allegedly illustrate proper application of a *Daubert* analysis to testimony like McCain's. In *Hopkins v. NCR Corp.*, 1994 U.S. Dist. LEXIS 17273 (M.D. La. 1994), the court rejected the theories of plaintiff's expert witness concerning the alleged defectively designed proof encoder: "The court does not intimate that the expert opinions offered by the Plaintiff are scientifically or technically inaccurate, false or misleading. The court merely holds that the Plaintiff has failed to show that the expert opinions submitted are reliable. Daubert requires

that expert testimony be based on something more than mere speculation." Despite the opinions of the expert, the court found that the methodology of the expert had not been tested or subjected to peer review. Regarding the expert's conclusions, the court noted, he had neither performed measurements or calculations to quantitatively support his opinion nor provided proof that his hypothesis had been peer-reviewed/accepted. The *Hopkins* court granted summary judgment for the employer.

Defendant also relies upon *Oglesby .v General Motors Corporation*, 190 F.3d 244 (4th Cir. 1999), in which the Fourth Circuit granted summary judgment for the defendant. The Fourth Circuit affirmed the district court's decision to reject (on Rule 702 grounds and citing *Kumho*) the opinion of a mechanical engineer proffered by the plaintiff as his expert. Despite the expert's general qualifications, the court found the testimony not sufficiently reliable or drawing from specialized knowledge. Further, the *Oglesby* court stated: "We have admonished that 'a plaintiff may not prevail in a products liability case by relying on the opinion of an expert unsupported by any evidence such as test data or relevant literature in the field.'" The expert lacked data or calculations to support his opinion, rendering his theory merely speculative.

Finally, Attwood highlights *Peitzmeier v. Hennessy Industries, Inc.*, 97 F.3d 293 (8th Cir. 1996), in which the Eighth Circuit affirmed summary judgment for the manufacturer of a tire changing machine. The plaintiff had been injured when a tire (which was not properly sized to the rim on which it was being installed) exploded and struck plaintiff while he was attempting to mount the tire on the rim using defendant's tire changing machine. The plaintiff introduced expert testimony criticizing defendant's failure to include certain design features in the tire changing machine. In reliance on *Daubert*, the trial court excluded the expert's testimony. The Eighth Circuit

43

affirmed the decision of the trial court, noting that the expert had not designed or safety tested any of the design features he proposed, that the alternate design consisted merely of rough sketches, and that the expert "has shown no factual basis to support an opinion that his design changes are feasible or that they would not hinder the efficacy of Hennessy's prior tire-changing model." The court noted that the expert's theories had not be subjected to peer review and rejected plaintiff's position that peer review had occurred as a result of the witness's prior testimony in other products liability cases. Furthermore, the Eighth Circuit found, plaintiff had not satisfactorily addressed known or potential rate of error and proven general acceptance in the scientific community. Moreover, the expert witness had failed to conduct experiments or testing. According to Attwood, similar problems exist with McCain's testimony.

## II.   **Plaintiff's Response**[25]

### A.   **Facts According to Plaintiff**

While on the R&D Committee for the National Safety Council, McCain dealt with code violations or code interpretations in many different fields. McCain has 40-50 years' experience dealing with mechanical engineering of various products manufactured by various manufacturers and has gained knowledge with respect to standards, rules, regulations, and the process of manufacturing equipment.

While serving in the United States Army as an Airborne Ranger, McCain used hooks similar to the Attwood universal snap hook for aircraft jumps, rappelling, water rescue operations, etc. These devices were used in real-time situations, such as twelve combat drops in Korea, and also in

---

[25] This court will not repeat facts regarding McCain's qualifications, etc., already discussed in this memorandum opinion.

hundreds of training sessions, including the training of other persons with respect to proper use and safety technology. *See* McCain Affidavit. McCain has personal marine experience in the operation of three boats over a period of 25 years, including pulling skiers, and he was also on the Board of Directors of the Sandestin Corporation, directing the operation of a yacht club.

Neither McCain nor Smith (defendant's expert) found any standards or regulations pertaining specifically to the universal snap hook. Instead, McCain applied the hierarchy of engineering analysis[26], looking at how the product works, determining the extent of its sharpness, and determining whether the universal snap hook was the kind of product in which sharpness couldn't be designed away or guarded against. McCain developed alternative design suggestions and located examples of proposed alternative designs. He looked for and secured examples of manufacturers of marine safety hooks that employed warnings, and he located manufacturers that used warnings on their packaging.

According to McCain's affidavit, the existence of alternative designs and warnings on other products establishes the ease and economic feasibility of using an alternate design as well as foreseeability of the safety problem at issue. McCain published an article for NAFE that discussed the hierarchy of engineering as applied to gas explosions. The hierarchy allegedly prescribes the following steps: (1) elimination of the hazard if feasible; (2) if the hazard cannot be eliminated, the application of safety technology to reduce the hazard (use of guards, interlocks, etc.); (3) the use of

---

[26] According to McCain, the hierarchy of engineering applies to all products and was first published by the National Safety Council around 1950. Since the 1950's, McCain alleges, OSHA as well as the American National Standards Institute and the National Safety Council, have all utilized the hierarchy of engineering as a generally accepted design analysis criteria applying to all products. McCain further asserts that the hierarchy is peer-reviewed and has been discussed in numerous publications and articles.

instructions or warnings; and (4) the investigation of the use of personal protective equipment. *See* McCain Affidavit.

According to McCain, it does not take a marine expert to understand the dangers of not applying standard guarding principles. McCain has testified on guarding or warning issues in 100-150 cases, over a spectrum of industries. He has testified as an expert in federal court on guarding/warning principles. Plaintiff argues that McCain's mechanical engineering background qualifies him to discuss the requirements of the hierarchy of engineering with professional certainty. The Attwood universal snap hook, McCain opined, could be guarded while maintaining utility and redesigned to utilize a blunted end device to eliminate the cutting effect and thus reduce the chance of injury. Warnings, McCain contends, could be easily placed on the packaging or the product itself, and blunted end devices are already available specifically in the marine industry.

Turnipseed then addresses the competing expert's, Smith's, qualifications. Smith does not have a mechanical engineering degree. Smith does have a Naval Architecture Degree, which focuses on shipboard machinery rather than machinery in general. Smith has taken and passed the PE exam. Smith has not been involved in pulling anyone on the water with any type of device in about 25 years. He has used a universal snap hook for a fifteen-foot sailboat. Smith did not use universal snap hooks in his naval career and has never written any articles or presented any papers on appropriate design of a device like the universal snap hook. Smith is not a member of the National Safety Council or the American National Standards Institute. Smith has not written any article on design or guarding issues regarding whether guards or warnings should be employed.

In general mechanical engineering, Smith acknowledged, engineers look at the way things work and how strong equipment needs to be for it to work. He admitted that an engineer in general

46

thinks about the way things are hooked together and what forces are involved in how things work. In the absence of specific standards or regulations for the universal snap hook, Smith agreed, one can employ some general guarding principles to the design of the product.  Smith agreed that the manufacturer/designer has the duty to provide products that are reliable and safe for their intended use and should be aware of reasonably foreseeable misuse.  He agreed that general engineering standards apply in the absence of a particular standard and agrees with the basic tenants of the hierarchy of engineering.

**B.    Argument**

**1.    General Principles**

Whether to permit the introduction of expert testimony is within the trial court's discretion and will not be reversed by the appellate court unless the decision was "manifestly erroneous." *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK LTD*, 326 F.3d 1333, 1339-40 (11th Cir. 2003). A trial judge has considerable leeway in determining whether particular expert testimony is reliable. *See Whatley v. Merit Distrib. Servs.*, 166 F. Supp. 2d 1350 (S.D. Ala. 2001).  The proponent bears the burden of establishing by a preponderance of the evidence the expert testimony's admissibility under Rule 702. *Id.*

Rule 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The district court serves as a gatekeeper to admission of scientific testimony. *See Quiet Technology*

at 1340.  The *Daubert* criteria provide a guide in the gatekeeping process, and no single factor is

determinative.  *See McGee*, *supra*, at 6.

Plaintiff relies upon *Senn v. Carolina Eastern, Inc.*, 111 F. Supp. 2d 1218 (M.D. Ala. 2000),

which stated:

> [T]he Supreme Court [in *Kumho*] held that "*Daubert*'s general holding--setting forth
> the trial judge's general 'gatekeeping' obligation--applies not only to testimony based on
> 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized'
> knowledge." 526 U.S. at 141, 119 S.Ct. 1167 (quoting Fed.R.Evid. 702). Thus, even where
> an expert witness posits an experience- based opinion, as opposed to a purely scientific
> opinion, "a trial court may consider one or more of the more specific factors that Daubert
> mentioned when doing so will help determine that testimony's reliability." Id. Moreover, the
> Kumho Court emphasized, as did the Daubert Court, that the test of reliability is " 'flexible,'
> " and that "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all
> experts or in every case." Id.; see also Daubert, 509 U.S. at 594, 113 S.Ct. 2786.

Additionally, Turnipseed points out, the district court's gatekeeper role is not intended to supplant

the adversary system or the jury's role.  *See Quiet Technology*, *supra*, at 1341.   The *Quiet*

*Technology* court cautioned the district courts to "take care not to conflate" the three inquiries in

Rule 702.  *Id.*  Moreover, plaintiff quotes *Senn* as follows: "[The] focus must be solely on principles

and methodology, not the conclusions they generate."  *See Senn*, *supra*, at 1200.

Plaintiff further cites *Whatley v. Merit Distribution Services,* 166 F. Supp. 2d 1350 (S.D Ala.

2001) for the notion that amended Rule 702 does not authorize the exclusion of an expert's

testimony on the grounds that the court believes one expert's version over another.  According to that

case, plaintiff contends, exclusion should be the exception rather than the rule.  Furthermore,

plaintiff observes, *Whatley* noted that the Advisory Committee for 702 explained that the rule was

not a codification of the *Daubert* factors, but rather application of those factors will vary depending

on the type of expert testimony.  Finally, plaintiff argues, *Kumho* pointed out that *Daubert* factors

do not constitute a definitive test and "may or may not be pertinent in assessing reliability, depending on the nature of the issues, the expert's particular expertise, and the subject of his testimony."

> **2.    McCain's Expertise in this Matter is Appropriate and His Testimony is Reliable.**

According to plaintiff, criticism of McCain's expertise on the basis that he is a mechanical engineer with no background in the marine industry is unfounded. "[A]n expert's training does not always need to be narrowly tailored to match the exact point of dispute in a case." *McGee* at 3.[27]

Plaintiff quotes *Whatley*: "[The particular expert opinions at issue] do not fall within the rubric of 'junk science' as [the experts] appear to be qualified professionals with relevant expertise and experience [in their recognized fields.] After a review of the evidence in question and after due consideration to Defendants' motions and the arguments contained therein, the proffered testimony is not the type of problematic 'pseudoscientific' expert evidence envisioned under *Daubert/Kumho Tire's* reliability criteria."

Furthermore, plaintiff argues, *McGee, see supra*, is instructive.[28]  Here, plaintiff argues,

---

[27] Plaintiff repeats facts from McCain's background which have already been detailed in this memorandum opinion.

[28] Due to plaintiff's extensive reliance on *McGee*, this court provides the following excerpt:

> Here, as mentioned above, the proffered testimony of David Brown is grounded upon his knowledge of general engineering concepts and his related experience in accident reconstruction. Clearly, unlike the fields of "laboratory or medical testing, which employ rigorous and replicable protocols, technical fields such as engineering often involve more idiosyncratic methods of design and testing." Milanowicz, 148 F.Supp.2d at 532. As a result, it is not unusual for a technical expert, such as an engineer, to state that his opinions are not based upon any specific method, but are based solely upon his general experience and knowledge after a review of the evidence. See id.
>
> Nonetheless, this Court finds that the general field of engineering need not be portrayed so obscurely. As other courts have noticed,
>> [i]t seems exactly backwards that experts who purport to rely on general engineering principles and practical experience might escape screening by the district court simply by

McCain inquired into whether there were industry standards, furnished industry publications

---

> stating that their conclusions were not reached by any particular method or technique. The moral of [such an] approach would be, the less factual support for an expert's opinion, the better."

Id. (quoting Watkins, 121 F.3d at 991). While, of course, engineers may not necessarily be required to fulfill the demands of a rigid professional protocol in every case, it is well known that engineers routinely "rely upon established principles of physics, material sciences, and industrial design and often utilize technologically sophisticated and carefully calibrated testing methods and devices" when arriving at their conclusions. Id. As such, the accepted methodology, characterizing the practice of an expert in the field of engineering, simply does not involve guess work or even conjecture; rather, accepted methodology more often involves some inquiry into industry standards, practices, or publications and results in conclusions based upon concrete data, testing, measurements, or calculations. See id. at 532-536.

Other district courts dealing with product liability cases, similar to the one at bar, have likewise held engineering experts to such standards of professional practice. Those courts have recognized that an expert should employ a methodology which includes: testing or specific identification of alternative designs; written calculations in support of the experts theories; or inquiry as to whether the suggested alternative is feasible. E.g., Watkins, 121 F.3d 992-93 (excluding expert testimony where no testing or calculations were done to show that modification would not hinder product's utility); Colon, 199 F.Supp.2d at 77-78 (excluding expert testimony where no test data or design sketches were provided to show that modification would make product safer); Clarke v. LR Systems, 219 F.Supp.2d 323, (E.D.N.Y.2002) (noting that the expert appeared to have done some risk/utility analysis to determine whether the product was defective).

In Milanowicz v. Raymond Corp., 148 F.Supp.2d 525 (D.N.J.2001), the district court of New Jersey actually conducted a survey of product liability cases nationwide and identified several components of reliable methodology employed by experts offering opinions on product defect and design. Id. at 532-536. The court concluded that, when an engineer offers an opinion with respect to a product defect or the existence of an alternative design, it is relevant to weigh: (1) whether the expert relied on applicable standards, industry practice, or professional publications; or (2) whether the expert engaged in any substantive testing, measurements, or calculations to support his theories, or otherwise created illustrative models, charts or diagrams of any proposed design changes. [FN1] See id.

> FN1. This Court has consolidated the nine specific factors originally listed in Milanowicz into two more general categories.

This Court agrees that when included within a proffered engineering expert's methodology, the Milanowicz criteria does in fact provide an indicia of reliability to the testimony of an expert in a products liability case. The first category of factors contains those sources that an expert may consider and incorporate as part of a reliable methodology, while the second category contains those things that the expert may actually do in an effort to show that his conclusions are reliable. Naturally, no single factors is determinative. Likewise, this criteria is not identified in an effort to ignore Daubert's initial considerations; rather, these more specific factors incorporate Daubert's more general considerations, while also acting to define what level of rigor characterizes the practice of an expert proffering opinions about product design. With this criteria in mind, the Court now turns to the proffered testimony in this case and the specific methodology employed by David Brown in reaching his conclusions.

regarding the hierarchy of engineering, and identified specific alternative designs.

Additionally, plaintiff contends, defendant's criticism of McCain's failure to test alternative designs is invalid, again citing *McGee*. Plaintiff relies on this excerpt from *McGee*:

> The Court further notes that Mr. Brown failed to properly reference industry practice or to point to any industry publication that supports his theories. It is often relevant "whether other manufacturers and consumers in the industry utilize the allegedly defective design or proposed alternative." *Milanowicz*, 148 F. Supp. 2d at 533. In fact "[i]ndustry practice may be used as a proxy for peer review" and "may help negate criticism based on lack of testing." *Id.* "Conversely, the absence of industry practice – or the expert's failure to include such evidence – may undermine the proposed alternative."[29]

In the instant case, Turnipseed asserts, McCain has identified blunt as opposed to sharp ends as an alternative design. Such designs, McCain asserts, are used in the marine industry. McCain has also highlighted the use of guards in similar, non-marine products, *see* Def. Ex. 9, and the use of warnings in the marine industry, *see* Def. Ex. 6.

The *Senn* case, plaintiff argues, is analogous since the district court determined that the expert's methodology met the *Daubert/Kumho* standard of reliability due to his extensive background and experience, review of publications, and work with other experts in the field. Even in the absence of testing, plaintiff notes, the *Senn* court determined that the lack of testing should go to the weight, rather than the admissibility, of the expert's testimony.

Here, Turnipseed contends, McCain did not just volunteer an offhand opinion. Instead, plaintiff argues:

> This ... is a situation where an experienced mechanical engineer, applying

---

[29] *McGee*, this court notes, went on to discuss the absence of testing (both of the alleged defective design and proposed alternatives) as a factor in the decision to exclude expert testimony. This court has considered these portions of *McGee* but does not reproduce them here.

> engineering principles applicable across the board . . . (as acknowledged by defendant's retained engineer), upon exhausting a search for specific standards and regulations to the Universal Snap Hooks, applied standard engineering and design concepts, with a tried and true peer-reviewed methodology adopted by such groups as the American National Standards Institute, the National Safety Council, and OSHA.  McCain then found alternative designs and the application of warnings already existent in the industry as demonstration of the foreseeability of a problem and the feasibility of their application in the industry.

Moreover, plaintiff reiterates, mechanical engineering is the relevant discipline here, not marine engineering.  McCain's testimony, Turnipseed contends, is based on good grounds, given the fact that the proposed design changes are not merely theoretical but actually exist in the marketplace.  This fact, plaintiff argues, "moots the *Daubert* factor of testing for reliability."[30]  Plaintiff adds that peer-reviewed publications attest to the general acceptance of McCain's hierarchy of engineering approach.

As noted in *Senn*, plaintiff asserts, where "expert testimony 'rests on 'good grounds,' based on what is known, it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear they will not grasp its complexities or satisfactorily weigh its inadequacies."  *See Senn* at 1222 (quoting *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

### 3.    Defendant's Cases are Distinguishable.

*Oglesby*, plaintiff argues, involved an expert who could not point to any data or calculations supporting his theory.  Here, plaintiff contends, McCain pointed to relevant literature in the field regarding the hierarchy of engineering.  Again, plaintiff argues (in reliance on *McGee*), McCain's reliance on alternative designs in use in the industry serves as a sufficient substitute for testing.

---

[30] Again, this court notes, it is not clear that *McGee* stands for so strong a proposition.

Likewise, plaintiff contends, *Peitzmeier* is distinguishable because that expert's alternative design consisted merely of a series of rough sketches with no factual basis to support his opinion that his design changes were feasible. Additionally, plaintiff points out, the expert's theories had not been subjected to peer review. Here, plaintiff argues, there are feasible alternative designs and warnings extant in the industry, and the hierarchy of engineering has been subjected to peer review. Finally, plaintiff asserts, *Hopkins* is distinguishable because the expert's opinion was rejected for being speculative. Again, plaintiff relies on industry practice here regarding alternative designs and warnings.

### 4.    Conclusion

A *Daubert* hearing, plaintiff asserts, is not necessary here. *See United States v. Major,* 196 F.3d 1206, 1215 (11th Cir. 1999)(finding district court did not err in admitting expert's testimony without a hearing). According to Turnipseed, *Daubert* hearings are not required by law or the rules of procedure and are typically only held when a hearing would be fruitful and a constructive use of the court's time and resources. *See,e.g., City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F. 3d 548, 564 (11th Cir. 1998)(stating in dicta: "While Daubert hearings are not required by law or by rules of procedure, they are almost always fruitful uses of the court's time and resources in complicated cases involving multiple expert witnesses, such as the instant case.") Further, plaintiff contends, *Kumho Tire* noted that the trial court has the authority to avoid unnecessary proceedings in ordinary cases.[31]

---

[31] In this regard, this court notes, *Kumho* stated:

> The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable. Our opinion in *Joiner* makes clear that a court of appeals is to apply an abuse-of-discretion standard when it "review[s] a trial court's

In light of McCain's position as a degreed mechanical engineer with four decades of experience, the application of a peer-reviewed generally accepted methodology, and his identification of alternative designs and warnings on products existing in the market, plaintiff argues, "the reliability of [McCain's] methods can properly be taken for granted."

## III.   Defendant's Reply

According to defendant, plaintiff's response only highlights the inadequacies of McCain's expert testimony.   *McGee*, Attwood asserts, "particularly underscores McCain's lack of any foundation to offer an opinion in this case."   In that case, the district court granted defendant's motion to exclude expert testimony which attempted to show that a child safety seat involved in the lawsuit was defective.   While the *McGee* court characterized the qualification of the expert (a registered professional engineer with a masters degree in Mechanical Engineering from Ohio State, twenty years of consulting experience in automobile accident reconstruction, publication of an article on that subject, and service as an expert witness in approximately 150 automobile cases nearly half of which involved car seats/other restraints) as not "particularly impressive" and "minimally

---

decision to admit or exclude expert testimony." 522 U.S., at 138-139, 118 S.Ct. 512. That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion. Otherwise, the trial judge would lack the discretionary authority needed both to avoid unnecessary "reliability" proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises. Indeed, the Rules seek to avoid "unjustifiable expense and delay" as part of their search for "truth" and the "jus[t] determin[ation]" of proceedings. Fed. Rule Evid. 102. Thus, whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine. See *Joiner*, supra, at 143, 118 S.Ct. 512. And the Eleventh Circuit erred insofar as it held to the contrary.

sufficient," defendant argues, the *McGee* court pointed out that the expert "has not had any experience in the actual design or manufacture of child seats and has had extremely little, if any, non-litigation experience in evaluating such designs."  *See McGee* at 7 (emphasis added).  In the instant case, defendant contends, McCain's qualifications to give testimony are even less impressive.

According to Attwood, the *McGee* court based its decision to exclude the expert testimony on its assessment that the methodology used lacked "the indicia of reliability" required to make it admissible.  Certain observations of the *McGee* court, Attwood asserts, are pertinent to Attwood's motion in this cause.  First, Attwood notes, the Court observed:

> Regardless of what factors are specifically relied upon, however, the district court's ultimate responsibility is simply to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of experts in the relevant field"....*see also, Watkins v. Telsmith*, 121 F.3d 984, 991 (5th Cir. 1997)(noting that the application of *Daubert's* factors is germane in "evaluating whether the expert is a hired gun or a person whose opinion in the courtroom will withstand the same scrutiny that it would among his professional peers.")(Emphasis added).

More significantly, Attwood contends, *McGee* failed to accept on faith the proffered expert opinion in the absence of any evidence of a reliable underlying methodology.  Attwood provides the following excerpts from *McGee*:

> Clearly, unlike the fields of "laboratory or medical testing, which employ rigorous and replicable protocols, technical fields such as engineering often involve more idiosyncratic methods of design and testing." ...As a result, it is not unusual for a technical expert, such as an engineer, to state that his opinions are not based upon any specific method, but are based solely upon his general experience and knowledge after a review of the evidence . . . .
>
> Nonetheless, this Court finds that the general field of engineering need not be portrayed so obscurely.  As other courts have noticed:
>
> It seems exactly backwards that experts who purport to rely on

55

general engineering principles and practical experience might escape screening by the District Court simply by stating that their conclusions were not reached by any particular method or technique. The moral of [such an] approach would be, the less factual support for an expert's opinion, the better."

While, of course, engineers might not necessarily be required to fulfill the demands of a rigid professional protocol in every case, it is well known that engineers routinely "rely upon established principles of physics, the material sciences, and industrial design, and often utilize technologically sophisticated and carefully calibrated testing methods and devices" when arriving at their conclusions. As such, the accepted methodology, characterizing the practice of an expert in the field of engineering, simply does not involve guess work or even conjecture; rather, accepted methodology more often involves some inquiry into industry standards, practices, or publications and results in conclusions based upon concrete data, testing, measurements or calculations....

Other District Courts dealing with product liability cases, similar to the one at bar, have likewise held engineering experts to such standards of professional practice. Those Courts have recognized that an expert should employ a methodology which includes: testing or specific identification of alternative design; written calculations in support of the expert's theory; or inquiry as to whether the suggested alternative is feasible.

*McGee* at 11-14 (citations omitted; emphasis added).

Attwood argues that McCain employed no "methodology" but simply went to a store and purchased some carabiners designed for rock climbing then contended that their existence supports the claim that the universal snap hook (intended for marine use) should include the same features. Attwood again highlights McCain's lack of testing to determining if the changes he proposed would allow the snap hook to operate with the same degree of utility in a marine environment as it does in its present form. As for the Sea Sense hook, Attwood argues, it does not incorporate the same features which he contends the Attwood snap hook should have in order to avoid being defective and unreasonably dangerous.

Additionally, Attwood contends, McCain's purported methodology of the "Hierarchy of

56

Engineering" is less substantial than his qualifications.  His two attached articles written by Vincent A. Gallagher refer to the hierarchy.  According to defendant, the second article, entitled "Unsafe Design - Falls and Machine Hazards" gives the following shorthand rendition of what Gallagher deems the "Hierarchy of Controls":

### Hierarchy of Controls

| | |
|---|---|
| **First Priority:** | Eliminate the hazard and/or risk. |
| **Second Priority:** | Apply safety technology to reduce the risk. |
| **Third Priority:** | Use training, instructions, and warning signs. |
| **Fourth Priority:** | Use personal protective equipment. |

The *Milanowicz* case cited by plaintiff, Attwood asserts, involved an expert who apparently purported to base his testimony upon the same "hierarchy" which McCain recites here.  The court stated:

> Stephens also did not find adequate support for his conclusions in the relevant literature. While he claims to have reviewed a number of manuals and articles, the only citations he provides in his report are for the rather uncontroversial propositions that the elimination of identifiable, foreseeable hazards is a fundamental concern in industrial design and that users be warned of those hazards which have not been eliminated. (Pls.' Opp. Br. Ex. B at 7- 8). As he testified at his deposition, he used these references as the "foundation" for his report. (Def.'s Supp. Br. at 235). However, he conceded that he never seen a technical publication or any other document which criticized lift trucks such as the Raymond Model 40 for not utilizing powered fork positioners or which argued that powered fork positioners were a necessary safety feature. (Id. at 234-35). Moreover, he testified that he had never seen an article, product report, or advertisement in a trade publication regarding lift trucks sold with powered fork positioners, though he did state that he had seen an advertisement for powered fork positioner as an attachment. (Id. at 184). In short, beyond general design principles, Stephens identified nothing in the literature which would suggest peer review of his conclusions.

After arguing that this "Hierarchy of Engineering" is "little more than a generic safety bromide," Attwood further argues that its point of beginning is the assumption that the item in question is defective.  However, Attwood argues, that is exactly what plaintiff must prove in this

57

case, presumably via McCain's testimony.  According to Attwood, McCain has failed to offer any competent evidence to support this vital element.

Addressing plaintiff's discussion of Smith's expert testimony, defendant contends, "the problem with that approach is that Attwood does not have the burden of proving that the universal snap hook is defective...."

## CONCLUSIONS OF THE COURT

It is apparently not disputed that the defendant's catalogue, which is not generally distributed to consumers, contains a warning against use of the subject snap hook where life and limb are at risk.  While the package in which the snap hook is sold refers to a <u>Universal</u> Snap Hook, is sold in sporting goods stores,  and says "use on motor safety lines or <u>tow</u> <u>ropes</u>," that package contains no warning with regard to life or limb or use to pull tubes, etc.

While the risk related to use of the snap hook for tube tows may relate primarily to the possible flailing of an uncontrolled metal hook and not specifically to the pointed part(s) of the hook, there is no question that the flailing of the hook here was the cause of the injury.  The pointed parts of the hook exacerbated the injury, but the flailing was the initial cause.  There is at least a reasonable inference that the warning should have been on the product's package.  The defendant has not provided the court with any controlling cases(s) which hold that the failure to place a required warning on a package is remedied by a warning on another product such as the tube; particularly if there is no evidence that the warning on the tube was observed.  A question of fact as to awareness is raised.

Since the primary warning issue may relate to possible flailing and the pointed tips may be merely incidental, it may not be totally significant that the gate and hook tips were out of line.

58

In any event, this court cannot determine as a matter of law that it was not reasonably foreseeable that such a misalignment could occur.

Prior to trial, the court will, on request, conduct a hearing to determine whether McCain is qualified to testify as to warnings requirements.  The court will not presently exclude all of his testimony.  His lack of "marine" experience is not decisive.  The more important factor is his mechanical engineering experience.

The issue of contributory negligence is for the jury.  What the plaintiff was aware of and how he should have considered it is a factual one.

This court does not suggest that plaintiff's evidence is strong.  It is, however, substantial enough to survive summary judgment.

This the _____ day of _____, 2004.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

59